**IN THE COURT OF APPEALS OF IOWA**

No. 14-0673
Filed July 16, 2014

**IN THE INTEREST OF J.P.,**
**Minor Child,**

**L.P., Mother,**
        Appellant.

_____

        Appeal from the Iowa District Court for Polk County, Constance Cohen,

Associate Juvenile Judge.

        A mother appeals from the order terminating her parental rights.

**AFFIRMED.**

        Thomas Graves of Graves Law Firm, P.C., Clive, for appellant mother.

        Thomas J. Miller, Attorney General, Kathrine Miller-Todd, Assistant

Attorney General, John P. Sarcone, County Attorney, and Stephanie Brown,

Assistant County Attorney, for appellee State.

        Michael Bandstra, Des Moines, for minor child.

        Considered by Danilson, C.J., and Potterfield and McDonald, JJ.

**DANILSON, C.J.**

A mother appeals the termination of her parental rights to her child, J.P.[1] The mother has made some progress since the termination of her parental rights of her other son, but the State presented credible evidence she is still involved in prostitution and maintains a relationship with the father, both in direct violation of court orders and the terms of her probation. The mother requested additional time for reunification at the termination hearing, but "we do not gamble with [a child's] future by asking them to continuously wait for a stable biological parent," particularly at such a young age. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Her continued poor choices and the time the child has endured in limbo support affirming the juvenile court's order terminating the mother's parental rights.

## I. Background Facts and Proceedings.

The mother became involved with the Iowa Department of Human Services (DHS) in April 2012. At that time, the juvenile court entered an order temporarily removing J.P.'s older sibling from the mother's care after it was discovered she failed to provide him with proper medical care. Other concerns included the mother's incarceration as well as her extensive history of mental health issues, criminal behaviors,[2] and domestic violence. J.P.'s sibling was adjudicated a child in need of assistance (CINA) on May 5, 2012, pursuant to Iowa Code sections 232.2(6)(b), (c)(2), and (n) (2011). The mother's parental rights were terminated on December 27, 2012, pursuant to Iowa Code sections

---

[1] The parental rights of the father have also been terminated. He does not appeal.
[2] The mother was convicted of prostitution in August 2012.

232.116(1)(d), (h), and (k). In the written termination order, the juvenile court explained the mother's difficulties and her lack of stability:

As a child, [the mother] was physically abused and neglected, resulting in her becoming a child in need of assistance. She also had significant mental health problems which required commitment proceedings. She married [the father of J.P. and his sibling] on March 1, 2012, several months after [the sibling's] birth in November, 2011. She is currently pregnant.

[The mother] has previously been diagnosed with depression and bipolar disorder, but because of her current pregnancy of approximately five months, she is not taking any medication. . . .

[The mother's] housing is unstable. She is on the waiting list for two low-income housing programs. She testified that she is number 20 on one list and in the 300s on another. She currently resides with her sister . . . with whom she has had a chaotic relationship. She has also lived with her father during this case. He continues to abuse methamphetamine and has not resolved his own abuse issues. . . .

. . . .

[The mother] has very little, if any, insight into the domestic violence issues that impact her life and traumatize a baby. It is consistently reported that she and [the father] cannot communicate effectively and consistently argue, yell and become aggressive and violent with one another every time they are together. On many occasions, the police have been called and either [the father] or [the mother] has gone to jail. Their ties appear to thrive on drama and volatility. It is a very unhealthy relationship for both of them, yet they are unable to disengage from one another. The volatility of their relationship caused stress even when [the sibling] was born. [The father] was at the hospital for the birth, but he and [the mother] had an ugly argument. [The father] got upset and left. Yet they choose to continue their association, have sexual relations with one another, argue, cuss and scream at one another, and spend nights together.

. . . .

Although she has been employed in the past, [the mother] admits that she is too unstable to handle a job at the present time. She was sporadically employed within the last two years but quit those positions. She relies on the Young Women's Resource Center, family, and friends to help her with expenses. Most of these supports are not stable. She also has a debt of over a thousand dollars in criminal court fines, which could impact her liberty if her probation is revoked over her inability to pay them. She is not on a payment plan. She receives food stamps, which

enable her to provide for [the sibling's] needs at one and a half hours of visits per week, but has no plan to financially support him should he be in her care full time. She is applying for SSI, but the status of that application is unknown.

J.P. was born in May 2013. On June 26, 2013, the State filed a petition alleging J.P. was a child in need of assistance due to the prior termination of the parents' rights regarding J.P.'s sibling and their lack of participation in services. On July 12, 2013, the juvenile court held a pretrial conference at which time J.P. remained placed with the mother, but the court ordered family safety, risk, permanency services and counseling for the mother, as well as ordering no unauthorized contact with the father.

J.P. was adjudicated a CINA on August 2, 2013, pursuant to Iowa Code section 232.2(6)(c)(2) and (n) (2013). He remained in the mother's care at that time.

Following a disposition hearing on September 10, 2013, J.P. remained in his mother's care. The juvenile court confirmed that the mother needed to attend therapy and provide documentation to confirm her participation. The court also ordered the mother to comply with all probation requirements and to assure J.P. had no unauthorized contact with the father, who had expressed a desire to voluntarily terminate his rights and who had unresolved addiction issues and domestic violence concerns.

On October 25, 2013, the State filed a motion to modify the child's placement, requesting J.P. be placed in foster care. The motion alleged the mother was missing therapy appointments, parenting classes, and medication review. It also stated she no longer had stable housing, was spending time with

known drug users, had been involved in prostitution, and was allowing J.P. around people not approved by DHS, including the father. The court signed an order placing J.P. in the DHS's custody, but the mother absconded with J.P. The child was located three days later, at which time he was placed in foster care.

The matter of modification was litigated on November 13 and December 3, 2013. The mother did not contest the modification of custody but requested J.P. be placed with another suitable person, a family friend. The court noted that the family friend had used considerable effort to convince the mother to return with J.P. and turn over custody to DHS. The court placed J.P. with the family friend, finding that "this family can offer a level of familiarity for [J.P.] that will support his mental health and well being."

The State filed a petition to terminate the mother's parental rights on December 31, 2013.

The juvenile court held a permanency hearing on January 30, 2014. At the hearing, the court found that modification of placement was again necessary, as the family friend had violated the court's order by allowing the mother unauthorized contact with J.P. The mother requested that J.P. be placed with the maternal grandfather, but the court denied her request due to the grandfather's extensive history of abuse, neglect, and addiction. The court also found the mother was making some progress engaging with services and was employed, but she did not have stable housing and had not resolved her long-standing mental health problems.

The hearing on the petition to terminate the mother's parental rights was held on March 24 and April 8, 2014. Following the hearing, the court issued a written order explaining facts and reasons supporting termination:

> [The mother] made impressive progress during the latter half of her pregnancy with [J.P.] in dealing with her mental health and decision-making. These actions resulted in the [the mother] maintaining custody of her infant son . . . despite the recent history of termination of parental rights. Unfortunately, [the mother] was unable to sustain stability and protective concerns arose. Rather than reaching out to providers with whom she had developed relationships, [the mother] elected to run away from helping hands. She stopped attending therapy consistently, she stopped taking medications as prescribed and stopped meeting with providers consistently. Her decisions regarding individuals to whom she exposed [J.P.] were ill-advised and placed him at risk. These contacts were also in violation of direct Court orders requiring background checks. She continued to maintain a relationship with [the father] despite their violent history and lack of progress in resolving victimization issues. She did not protect [J.P.] from unauthorized contact with [the father].
>
> . . . .
>
> Also, during this time period, there were allegations that [the mother] was again involved in prostitution. This information came from more than one source, and these sources had nothing to gain by providing this information to the Department of Human Services. . . .
>
> It is promising that [the mother] has maintained employment since December 2013 cleaning businesses. She has also resumed therapy at Young Women's Resource Center. She resumed medication management after having disrupted that care in December 2013 due to financial problems. She was accountable for her decision to stop engaging in therapy earlier in the case, saying she had no excuse.
>
> Although her engagement has been consistent and positive since the filing of the petition to terminate parental rights, it is too soon to determine whether or not these changes will be lasting. She has only attended five sessions in therapy since resuming January 29, 2014. She missed two therapy sessions due to her own fault, and another session was cancelled on March 12 due to the therapist's personal emergency. . . .
>
> . . . . At this point, [the mother's] interactions remain professionally supervised. It has not been appropriate to relax this level of supervision due to ongoing concerns that [the mother] is not

stable in her mental health and that she is still involved in a relationship with [the father]. Within the month prior to the termination of parental rights litigation, [the mother] was relying on [the father] for transportation. . . .

[The mother] was able to obtain independent housing approximately one week before the termination litigation. She is the leaseholder and believes that she can sustain independent housing on her current income. Her rent is approximately $435 per month. Her income is approximately $1200 per month. She works seven days a week. She is unsure what she would arrange in terms of daycare, but believes she can rely on her friends.

. . . .

[The mother] is a young woman with a history of extensive trauma. As found in the termination order involving [J.P.'s] sibling, she continues to suffer from chronic mental illness for which she has been repeatedly institutionalized in the past. She continues to present a danger to herself or others as evidenced by prior acts. Her compliance with therapy and medication management has been so inconsistent during the course of this case that it has likely contributed to her decision-making regarding her ongoing relationship with [the father], her ability to be protective of [J.P.], her unstable housing, and her overall credibility when testifying. While the Court would like to believe that [the mother] is well on her way to making permanent changes that would enable her to care for an infant in the foreseeable future, the evidence simply does not support such a conclusion.

The court terminated the mother's parental right pursuant to Iowa Code sections 232.116(1)(d), (g), and (k). The mother appeals.

## II. Standard of Review.

Our review of termination decisions is de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). We give weight to the juvenile court's findings, especially assessing witness credibility, although we are not bound by them. *D.W.*, 791 N.W.2d at 706. An order terminating parental rights will be upheld if there is clear and convincing evidence of grounds for termination under section 232.116. *Id.* Evidence is "clear and convincing" when there are no serious or substantial

doubts as to the correctness of the conclusions of law drawn from the evidence. *Id.*

## III. Discussion.

Iowa Code chapter 232 termination of parental rights follows a three-step analysis. *P.L.*, 778 N.W.2d at 39. The court must first determine whether a ground for termination under section 232.116(1) has been established. *Id.* If a ground for termination has been established, the court must apply the best-interest framework set out in section 232.116(2) to decide if the grounds for termination should result in termination of parental rights. *Id.* Finally, if the statutory best-interest framework supports termination of parental rights, the court must consider if any of the statutory exceptions set out in section 232.116(3) weigh against the termination of parental rights. *Id.*

### A. Grounds for Termination.

When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the order on any ground we find supported by the record. *D.W.*, 791 N.W.2d at 707. Iowa Code section 232.116(1)(d) provides that termination may be ordered when the court has previously adjudicated the child a CINA after finding the child to have been physically or sexually abused or neglected as the result of acts or omissions of the parent or the court has previously adjudicated a child who is a member of the same family a CINA after such a finding, and when the circumstances continue to exist despite the offer or receipt of services.

Here, the mother claims the circumstances that existed at the times J.P. and his sibling were adjudicated CINA do not still exist. She maintains that she has shown a willingness to follow the court's orders and has made substantial progress as a result. Specifically, she relies on the fact that she is employed, has obtained her own housing, and has regularly attended therapy sessions.

While the mother has made some progress, many of the negative circumstances present when J.P. and his sibling were each adjudicated CINA due to neglect still exist. The State presented credible evidence the mother was still involved in prostitution. The State also presented credible evidence the mother and the father were still in contact and involved in some type of relationship, although it was against court order and in violation of her probation for the mother to do so. The mother at first testified to the contrary, but she later admitted she had contacted the father and received a ride from him approximately one week before the hearing. Also, because the mother recanted testimony multiple times throughout the termination hearing, the court explicitly found her to be not credible. Additionally, although the mother had recently begun attending therapy more regularly and had received some benefit from it, she still had mental health issues to overcome and it was not clear she would maintain the positive changes.

The mother also claims she should have been granted a six-month extension under Iowa Code section 232.104(2)(b). Although the mother made some progress in the months leading up to the termination hearing, she had been involved with DHS for over two years at that time and had not made

sufficient progress to have even unsupervised visitation. There is no evidence the need for removal would no longer exist if the mother was given another six months. "Children simply cannot wait for responsible parenting. . . . It must be constant, responsible, and reliable." *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990). Furthermore, the DHS caseworker and the guardian ad litem recommended termination. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014).

Here, even after receipt of services, there is clear and convincing evidence the grounds for termination, pursuant to section 232.116(1)(d), have been met.

**B. Best Interests of the Child.**

Even if a statutory ground for termination is met, a decision to terminate must still be in the best interests of a child after a review of section 232.116(2). *P.L.*, 778 N.W.2d at 37. In determining the best interests of the child, we give primary consideration to "the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional conditions and needs of the child." *See* Iowa Code § 232.116(2).

Termination of the mother's parental rights will help J.P. achieve permanency. *See A.M.*, 843 N.W.2d at 113 (citing *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (noting the "defining elements in a child's best interest" are the child's safety and "need for a permanent home")). As recognized by the district court, the best interest of J.P. is for him to remain with his foster family. They have consistently cared for him and provided him with safety and stability. This is especially important because of the many

disruptions in care and residences J.P. has already experienced at his young age. J.P. has been integrated into his foster family, and they are willing to adopt him if the mother's parental rights are terminated.

We agree with the juvenile court's finding that it is in the child's best interests to terminate the mother's parental rights.

### C. Factors against Termination.

Iowa Code section 232.116(3) provides that "[t]he court need not terminate the relationship between the parent and child" under certain circumstances. A finding under subsection 3 allows the court not to terminate. *See P.L.*, 778 N.W.2d at 39. "The factors weighing against termination in section 232.116(3) are permissive, not mandatory, and the court may use its discretion, based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship. *A.M.*, 843 N.W.2d at 113

As a part of her argument concerning J.P.'s best interests, the mother argued the court should have given greater consideration to the strong bond between her and J.P. The closeness of the parent-child relationship is a factor against termination. Iowa Code § 232.116(3)(c). However, the mother-child bond should not override termination where, as here, the mother is unable to meet the child's needs for a consistent permanent home with a responsible parent, and the child is adoptable. Upon our de novo review, we conclude no exception or factor in section 232.116(3) applies to make termination unnecessary.

**IV. Conclusion.**

There is clear and convincing evidence that grounds for termination exist under section 232.116(1)(d), termination of the mother's parental rights is in the child's best interests pursuant to section 232.116(2), and no consequential factor weighing against termination in section 232.116(3) requires a different conclusion. Accordingly, we affirm termination of the mother's parental rights.

**AFFIRMED.**